UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| INVISIBLE FENCE, INC., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | No. 3:09-cv-25 |
| v. | ) | (Phillips) |
| | ) | |
| FIDO'S FENCES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM AND ORDER

**I.  Introduction**

This matter comes before the Court concerning the Plaintiff's Motion for Summary Judgment [Doc. 59] For the reasons that will follow, the Plaintiff's Motion for Summary Judgment [Doc. 59] is **DENIED**.

**II.  Statement of the Facts**

For the purposes of the present Motion, the following facts are taken from the Defendant's Response in Opposition to the Defendants' Motion for Summary Judgment [Doc. 63], and all disputed facts are construed in the Defendant's favor.

Fido's Fences, Inc. and/or its owner, William Coden, have been engaged in the sale, installation, and service of pet containment products in the Long Island, New York, area and surrounding areas since at least 1989.  Coden Aff., ¶3.  A typical outdoor pet containment product is a fenceless boundary using a concealed wire around the perimeter of a home which is

-1-

detected by a collar on a pet, designed to keep a pet within the boundaries of the property without the use of a physical barrier. *Id*. Similar concealed indoor pet containment systems are sold as well. *Id*.

    A. <u>Fido's Fences relationship with Canine Fence</u>

On or about June 30, 1989, Mr. Coden entered into a Distributor Dealer Agreement with a non-party in this case, The Canine Fence Company (hereinafter "CFC"). Coden Aff., ¶4. On December 1, 1996, the Coden-CFC agreement was replaced with an agreement between Fido's Fences and Canine Fence. *Id*. CFC is and was the exclusive distributor of pet containment systems sold by Invisible Fence, Inc. (hereinafter "Invisible Fence") and its predecessors in the New England area, parts of New York, and parts of New Jersey, with the authority to grant dealerships to third parties. Coden Aff., ¶5. As a result of the Dealer Agreement, Fido's Fences became a dealer for CFC, selling and installing Invisible Fence products in the Long Island, New York market. *Id*.

Fido's Fences and CFC had a profitable and long-standing relationship in which Fido's Fences sold and installed millions of dollars of Invisible Fence product. Coden Aff., ¶6. In fact, in 2007, Fido's Fences sold approximately 800 invisible fence systems resulting in a revenue stream of over $400,000 to CFC. *Id*. Further, in 2007, Fido's Fences was one of the largest dealers of Invisible Fence pet containment systems in the country. *Id*. As a result of these and other market measures, CFC, in or about December 2007, nominated Fido's Fences to be "2007 Super Dealer of the Year" in a program established by Invisible Fence. *Id*.

Fido's Fences and CFC established an accepted set of business practices built up over the 18 year relationship. Coden Aff., ¶7. These practices included Fido's Fences placement of orders, CFC's acceptance of orders and extension of credit to Fido's Fences for such orders, shipment of products to Fido's Fences, sale and installation of products by Fido's Fences, and Fido's Fences subsequent payment to CFC on a regular basis. *Id.* Historically, Fido's Fences was provided a time frame of several months to make payments on orders, and it regularly submitted multiple partial payments each month as it collected amounts due from its customers. *Id.* During all but the final months of the 18 year relationship, CFC did not complain of Fido's Fences method of payment.

While the 2007 Payment Terms provided that "[o]rders which would result in an account balance in excess of the Approved Credit Limit will not be shipped until payment has been arranged," no provision in either the 2007 Payment Terms or 1996 Dealer Agreement allowed for CFC to refuse to make new sales to Fido's Fences if it remained under the credit limit. Nevertheless, despite Fido's Fences $75,000 credit limit, CFC sent an email to Fido's Fences on January 14, 2008, notifying Fido's Fences that its account balance was $48,375.26, of which $37,699.45 was allegedly past due, and advising Fido's Fences that its account was being placed on hold preventing Fido's Fences from obtaining further product until its account was brought current. Coden Aff., ¶9, Ex. E.

After a check dated January 10 (i.e., prior to CFC's January 14 email) in the amount of $7,173.75 was credited to Fido's Fences account on January 15, CFC sent a letter to Fido's Fences on January 17, 2008, stating that the Dealer Agreement would be terminated if the account balance was not paid in full within a mere five days. Coden Aff.,

¶10, Ex. E and F.  The Defendant alleges that such termination and withholding of product was in direct violation of the Dealer Agreement and 2007 Payment Terms. In support of its position, the Defendant further alleges that the total account balance was less than half of Fido's Fences $75,000 credit limit, Fido's Fences had paid CFC over $30,000 over the previous fifteen days, and Fido's Fences did over $400,000 in business with CFC annually. [Doc. 63 at 5].

Although another partial payment in the amount of $9,476.34 was credited to Fido's Fences' account by CFC on January 18, 2008, which made the total past-due balance approximately $21,000 and the oldest unpaid invoice just twenty-two days over-due, Fido's Fences was unable to make full payment immediately. Coden Aff., ¶12. Citing the past-due balance, CFC continued to withhold product from Fido's Fences resulting in a loss of sales as well as Fido's Fences being unable to replace customer equipment under warranty. Coden Aff., ¶13.  At the same time, on January 14, 2008, Fido's Fences account on CFC's extranet ordering system was blocked, preventing Fido's Fences from entering orders or submitting warranty claims. *Id.*  Access to the extranet was never restored. *Id.* Additionally, on or about January 22, 2008, Fido's Fences was permanently removed from the CFC website as an authorized dealer in the Long Island area and all potential customers in the Long Island area visiting the CFC website were instead provided with CFC's contact information.  *Id.*, Ex. K.  It is the Defendant's position that these actions constituted a termination of the Dealer Agreement as of January 22, 2008, five days after the January 17 letter. *Id*.

The Defendant further alleges that CFC had in recent years taken similar actions against many other dealers in an apparent attempt to take over territories where third party dealers under contract with CFC had established strong sales, such as Fido's Fences' sales in the Long Island area. Coden Aff., ¶14. The Defendant argues that evidence of this intention can be seen in the market report attached as Exhibit G to the Coden Affidavit. As shown in Table 7 of the report, CFC's independent dealers served, based on population, approximately 99% of CFC's territory in 1992 with CFC servicing the remaining 1% directly. *Id*. However, by 2008, independent dealers had been reduced to serving only 14% of the territory while CFC obtained 86% of the market by, allegedly, taking over the independent dealers' territories and their customers. *Id.* Similarly, it is the Defendant's position that CFC's actions in terminating the Dealer Agreement in January 2008 were an attempt to take over the Long Island area for itself. Coden Aff., ¶15. In this regard, CFC broached the subject of a buyout of Fido's Fences in a phone call with Mr. Coden on January 18, 2008 (i.e., the day following CFC's letter providing notification of termination of the Dealer Agreement). *Id.*, & Coden Aff., Ex. E. During those discussions, the CFC representative indicated that Fido's Fences would not be able to sell pet containment systems in the future due to the pending termination of the Dealer Agreement, so a sale of the business appeared to be Fido's Fences only option. Coden Aff., ¶15. However, the Defendant asserts that it was clear that CFC had no intention to offer Mr. Coden fair market value for the business and the buyout talks quickly ceased. *Id.*

In view of the above, Fido's Fences filed suit against CFC on February 13, 2008, <u>Fido's Fences Inc. v. The Canine Fence Company,</u> Case No. 2:08-cv-754, (E.D.N.Y.), seeking

among other things to force CFC to comply with the terms of the Dealer Agreement and provide product and/or to find CFC in breach of the Agreement. On or about May 16, 2008, CFC provided formal notice to Fido's Fences that the Dealer Agreement was terminated. Coden Aff., ¶16. In order to fill customer orders, Fido's Fences purchased approximately 165 pet containment systems manufactured by a third party (at a cost of about $70,000) from March, 2008, through the alleged May 16, 2008, termination to meet customer demand. *Id.* CFC asserted that these sales breached the Dealer Agreement, which required Fido's Fences to exclusively sell Invisible Fence pet containment products..

On or about July 11, 2008, CFC filed a Motion for Preliminary Injunction seeking to enjoin Fido's Fences from using all of Fido's Fences telephone numbers. Coden Aff., ¶17. In support of the motion, CFC submitted a declaration from the CEO of Radio Systems Inc., which owns Invisible Fence, Inc., to support CFC's claim that Fido's Fences use of the telephone numbers was causing consumer confusion due to Fido's Fences alleged continued use of the Invisible Fence trademarks after the termination of the Dealer Agreement. *Id.* All such uses ceased by at least September 2008 and Fido's Fences has not used the term "invisible," alone or with any other term, in any material since that time. *Id*.

B. Fido's Fences dispute with Invisible Fence

In a series of three letters mailed between May 2008 and August 2008, Invisible Fence accused Fido's Fences of willful infringement of Invisible Fence's alleged marks. Coden Aff., ¶18, Ex. I. On December 2, 2008, Fido's Fences filed Petitions to Cancel Invisible Fence's U.S. Trademark Registrations for the Invisible Fence, Invisible, and Invisible

-6-

Fencing marks with the Trademark Trial and Appeal Board ("TTAB") of the U.S. Patent and Trademark Office. Fido's Fence's Petition claimed that the registered marks are generic and not entitled to trademark protection and, therefore, the registrations must be canceled. Invisible Fence then sued Fido's Fences on January 22, 2009, despite the fact that all allegedly infringing activity had ceased months earlier. Pursuant to its standard practice, the TTAB suspended the cancellation proceeding pending the final adjudication of this lawsuit. The TTAB proceeding remains suspended.

The litigation between Fido's Fences and CFC was settled on March 4, 2010, resulting in a dismissal of all claims and counterclaims with prejudice. Coden Aff., ¶19. Each party granted the other a full release. Fido's Fences is no longer in any relationship with CFC, and Fido's Fences has not sold Invisible Fence brand products since January, 2008. *Id*. However, CFC agreed that Fido's Fences could continue to sell, and it still sells, third party pet containment systems. *Id*.

**III.   Summary Judgment Analysis**

    **1.   The Standard**

Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "The moving party bears the initial burden of production." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "After the moving party has met its burden, the burden shifts to the nonmoving party, who must present some 'specific facts showing that there is a genuine issue for trial.'" *Jakubowski v. Christ*

*Hosp., Inc.*, 627 F.3d 195, 200 (6th Cir. 2010 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

In evaluating a motion for summary judgment, the court must construe all reasonable inferences in favor of the nonmoving party. *Hamilton v. Starcom Mediavest Grp., Inc.*, 522 F.3d 623, 627 (6th Cir. 2008) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 251-52. "[I]f the nonmoving party fails to make a sufficient showing on an essential element of the case with respect to which the nonmovant has the burden, the moving party is entitled to summary judgment as a matter of law." *Palmer v. Cacioppo*, 429 Fed. App'x 491, 495 (6th Cir. 2011) (quoting *Thompson v. Ashe*, 250 F.3d 399, 405 (6th Cir. 2001)).

Here, as the Plaintiff filed the Motion for Summary Judgment, the Court will construe all reasonable factual inferences in favor of the Defendant; furthermore, the Plaintiff will need to prove that there are no genuine issues of material fact and that the Plaintiff is entitled to judgment as a matter of law. *Id.*

The Plaintiff moves that the Court grant summary judgment on Counts I-III and VII of the Complaint and on the counterclaim asserted by Fido's Fences, Inc. Counts I-III seek a declaration from the Court that various trademarks are valid, and Count VII alleges breach of contract. [Doc. 1]. The Defendant's counterclaim moves that the Court issue a declaratory judgment finding that the Plaintiff has no valid, protectable trademark rights in the terms "invisible fence," "invisible fencing," and "invisible."

-8-

The Defendant argues, in rebuttal, that the facial contractual prohibition against challenging Invisible Fence's marks is unenforceable since Invisible Fence materially breached said contract prior to Fido Fences' challenge. Next, the Defendant argues that the doctrine of licensee estoppel is similarly inapplicable because the Plaintiff's marks have become generic—or synonymous with the genre of electronic pet containment as a whole. In summary, the Plaintiff's Motion presents two distinct questions for the Court to resolve: 1) whether Fido Fences is contractually barred from challenging the validity and enforceability of Invisible Fence's trademarks; and, 2) whether Fido Fences is equitably estopped from challenging the validity of Invisible Fence trademarks.

### A. Contractual Prohibition

The dealership agreement reads, in relevant part:

> Dealer acknowledges the validity of the Proprietary Marks and agrees that it shall not do anything to infringe upon, harm or contest the rights of the Company or Manufacturer in the Proprietary Marks owned by Manufacturer or Company, respectively, or in any other mark or name which incorporates the name "Invisible Fencing."… Upon termination of this Agreement for whatever cause, the permission for the use of the Proprietary Marks and names as aforesaid and any interest of Dealer therein shall cease forthwith, and Dealer will not use or claim the right to use any such Proprietary Marks or colorable imitations thereof. Dealer shall take such action and sign such documents as are reasonably required by Company or Manufacturer to evidence the fact that Dealer has ceased all use of and interest in such property.

[Doc. 60 at 11]. It is the Plaintiff's position that the aforementioned language "conclusively establish[es] that IFI is entitled to summary judgment as a matter of law." *Id.* at 12. Indeed, the contract is a facial prohibition against attacks on the underlying marks. However, the Defendant argues that the contractual prohibition is unenforceable since CFC breached the agreement prior

-9-

to the trademark challenge. The Plaintiff argues that the Defendant is precluded from raising this argument by an allegedly adverse decision in the Eastern District of New York regarding this very matter. More specifically, a prior suit in the Eastern District of New York involving Fido Fences and CFC was dismissed with prejudice via a joint stipulation of dismissal filed by the parties. [Doc. 68 Exh. J].[1] It is the Plaintiff's position that this dismissal bars the Defendant from reasserting its breach argument in this matter; the Plaintiff is incorrect.

        **i.       Claim Preclusion**

The doctrine of preclusion is intended to promote judicial efficiency and the finality of judgments by requiring that all related claims be brought together or forfeited (claim preclusion) and by prohibiting any party from litigating an issue that has been fully litigated previously (issue preclusion). In the prior suit Fido's Fences alleged breach of contract, unfair competition, deceptive acts and practices, and tortious interference with business relations among other claims. *See,* Amended Complaint *Fido's Fences, Inc. v The Canine Fence Company,* E.D.N.Y., No. 2: 08-cv-754. Invisible Fence argues that the dismissal of Fido's Fences breach of contract claim necessarily decided, adversely to Fido's Fences, the issue of CFC's breach of contract. However, issue preclusion, also known as collateral estoppel, "attaches only `[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment.'" *Arizona v. California,* 530 U.S. 392, 414, 120 S.Ct. 2304, 147 L.Ed.2d 374 (2000) (quoting Restatement (Second) of Judgments § 27 (1982)); *accord Pool Water Products v. Olin Corp.,* 258 F.3d 1024, 1031 (9th Cir.2001); *see also Allen v.*

---

[1] The Plaintiff adds that, "Moreover, as it admitted in its response brief, Fido's Fences granted CFC a 'full release' from its claims pertaining to the Dealer Agreement." [Doc. 68 at 2]. The release is discussed in more depth *infra at* note *2.

*McCurry,* 449 U.S. 90, 94-95, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980) (explaining that collateral estoppel has no application when "the party against whom the earlier decision is asserted did not have a `full and fair opportunity' to litigate that issue").

It appears to the Court that there was no actual litigation of any issue related to the breach of contract claim. A voluntary dismissal of a claim prior to any adjudication and without any stipulated findings of fact does not actually litigate any issue. *See Lawlor v. National Screen Serv. Corp.,* 349 U.S. 322, 327, 75 S.Ct. 865, 99 L.Ed. 1122 (1955) (holding that judgment dismissing previous suit unaccompanied by findings did not bind the parties on any issue); *Pelletier v. Zweifel,* 921 F.2d 1465, 1501 (11th Cir.1991) ("The preclusive effect of a dismissal with prejudice, an unlitigated matter, ... is examined under the requirements for claim preclusion. Since such a judgment is not accompanied by findings, it does not, however, collaterally estop the plaintiff from raising issues that might have been litigated if the case had proceeded to trial."); *Engelhardt v. Bell & Howell Co.,* 327 F.2d 30, 36 n. 1 (8th Cir.1964) (explaining that "[h]ere, as in *Lawlor,* collateral estoppel is not applicable [to the voluntary dismissal with prejudice] as the case was never tried and hence no findings of fact were made which the parties are precluded from challenging"); *cf. Arizona,* 530 U.S. at 414, 120 S.Ct. 2304 (explaining that consent judgments "ordinarily occasion no issue preclusion ... unless it is clear ... that the parties intend their agreement to have such an effect"); Restatement (Second) of Judgments § 27 cmt. e (1982) ("In the case of a judgment entered by confession, consent, or default, none of the issues is actually litigated."). Thus, issue preclusion cannot attach[2] to Fido's Fences voluntary dismissal

---

[2] Claim preclusion, or res judicata, bars "successive litigation of the very same claim" following a final adjudication on the merits involving the same parties or their privies. *New Hampshire v. Maine,* 532 U.S. 742, 748, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001); *accord Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 58 L.Ed.2d

of its breach of contract claim unless "it is clear…that the parties intend[ed] their agreement to have such an effect." [3] *Id.* And, there is no evidence on the record that would support such an assumption.[4]

Since the breach of contract claim is not precluded, the Court cannot grant summary judgment as there is at least one material fact that requires further litigation; namely, whether CFC breached its agreement with Fido's Fences. Of course, whether or not a party is in breach is a question of law; however, the factual scenarios that precipitated breach, and the truth or falsity of those allegations, are questions of fact best decided by a trier of fact. Accordingly, the Court finds the record is insufficiently developed to support summary judgment on this basis.

### B. Estoppel

The Plaintiff argues that even if there were a breach, the Defendant should be estopped from attacking the Plaintiff's trademarks pursuant to the doctrine of licensee estoppel. The doctrine or theory of licensee estoppel provides that a licensee should be, in many cases,

---

552 (1979) ("Under the doctrine of res judicata, a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action."); *First Pacific Bancorp v. Helfer,* 224 F.3d 1117, 1128 (9th Cir.2000); *Goddard v. Security Title Ins. & Guarantee Co.,* 14 Cal.2d 47, 92 P.2d 804, 806 (1939).

[3] The Plaintiff asserts that "…as it is admitted in its Response brief, Fido's Fences granted CFC a 'full release' from its claims pertaining to the Dealer Agreement. [Doc. 68 at 2]. However, the Plaintiff does not cite to the release itself; rather, the Plaintiff cites the Defendant's brief wherein the Defendant mentioned a release, but again, did not cite to any document on the record. The Court cannot find this elusive release and so is unable to examine its contents or scope. The absence of this release is discussed more fully by the Plaintiff in its memorandum in Support of the Plaintiff's Motion for Partial Summary Judgment. [Doc. 83].

[4] The dismissal of alternative claims in a pending suit does not adjudicate the entire cause of action, *see* 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 4407 (1981) (explaining that cause of action refers to "all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction... out of which the action arose") (quoting Restatement (Second) of Judgments § 24 (1981)), and therefore "[a] plaintiff who sets forth alternative remedies in separate counts in his complaint may abandon or dismiss one count without prejudice to his right to proceed on the other." *Steele v. Litton Indus.,* 260 Cal.App.2d 157, 68 Cal.Rptr. 680, 690 (1968). "The dismissal of... alternative remedies[does] not constitute a dismissal of plaintiff's entire cause of action." *Id.*

-12-

Case 3:09-cv-00025   Document 91   Filed 05/24/13   Page 12 of 16   PageID #: 2345

"estopped from claiming any rights against the licensor which are inconsistent with the terms of the license." *Westco Group, Inc. v. K.B & Associates, Inc.,* 128 F.Supp.2d 1082, 1091 (N.D.Ohio 2001). For instance, after obtaining the benefit of a trademark license but breaching the terms thereof, a licensee should not be able to "benefit from its own malfeasance" by "challeng[ing] a licensor's ownership of a trademark." Id at 1086–89; *see also Big Boy Restaurants v. Cadillac Coffee Co.,* 238 F.Supp.2d 866, 873–74 (E.D.Mich.2002).The Supreme Court of the United States has done away with licensee estoppel in the patent context,[5] but the doctrine remains part of trademark jurisprudence. *Lear, Inc. v. Adkins*, 395 U.S. 653, 674 (1969); *But see, Beer Nuts, Inc. v. King Nut Co.,* 477 F.2d 326, 328-29 (6th Cir. 1973) (distinguishing Lear).

The Plaintiff argues that this is an appropriate case for the application of the doctrine of licensee estoppel because the Defendant was a licensee of the Plaintiff's intellectual property yet now contests the legitimacy of the Plaintiff's marks. The Plaintiff argues,

> …[T]he Court should apply the doctrine of licensee estoppel to bar Fido's Fences from challenging the IFI Marks. The equities weigh heavily in IFI's favor. Fido's Fences and Mr. Coden enjoyed the benefits of being an IFI dealer for over twenty-two years until it failed to meet its payment obligations under the Dealer Agreement. Only after numerous warnings to satisfy its overdue balance did CFC place Fido's Fences' account on hold. Fido's Fences' answer was to sue CFC in an attempt to force CFC to provide it with more product that it apparently could not pay for.

[Doc. 60 at 16].

---

[5] In *Lear,* the Supreme Court held that, "Even in the more typical cases, not involving conscious wrongdoing, the licensor's equities are far from compelling. A patent, in the last analysis, simply represents a legal conclusion reached by the Patent Office. Moreover, the legal conclusion is predicated on factors as to which reasonable men can differ widely. Yet the Patent Office is often obliged to reach its decision in an *ex parte* proceeding, without the aid of the arguments which could be advanced by parties interested in proving patent invalidity. Consequently, it does not seem to us to be unfair to require a patentee to defend the Patent Office's judgment when his licensee places the question in issue, especially since the licensor's case is buttressed by the presumption of validity which attaches to his patent. Thus, although licensee estoppel may be consistent with the letter of contractual doctrine, we cannot say that it is compelled by the spirit of contract law, which seeks to balance the claims of promisor and promisee in accord with the requirements of good faith." *Lear, Inc. v. Adkins*, 395 U.S. 653, 670 (1969)

While the Plaintiff's version of the facts of this case may prove to be accurate, at this stage of the proceeding, the record is insufficient to make a determination that is, essentially, a question of equity more than law.[6]

Particularly instructive in the Court's consideration of this matter is a case that arose in the Middle District of Tennessee, *Kebab Gyros, Inc. v. Riyad*—which is relied heavily upon by the Defendants. In *Kebab,* the court wrote that,

> Here, the doctrine of licensee estoppel should not operate as an absolute bar to the assertion of the specific defenses in this case. Indeed, as discussed below, the defendant's main argument is that the mark at issue is not protectible [sic] because it is generic, or, failing that, because it is at most "merely descriptive" without a secondary meaning. As discussed herein, this is a credible argument, at least as to the latter point.

*Kebab Gyros, Inc. v. Riyad* 2009 WL 5170194 at*6-7 (M.D.Tenn.,2009). At this stage, the Court finds that the instant matter falls within the scope of considerations pondered in *Kebab*.[7]

Additionally, though the Plaintiff characterizes the Defendant's trademark challenge as "biting the hand that feeds them," licensee estoppel is unrelated to loyalty, or even forethought; rather, licensee estoppel is designed to estop "double dipping;" or, those who benefit from the both the market rewards of exclusivity while, at the same time, positioning themselves to reap the rewards of a defeated mark. Such a scenario would unfairly reward the licensee at the expense of the licensor's exclusivity right, which is the only market right the licensor possesses.

After a licensing agreement has been terminated, as it was here, licensee estoppel has a very narrow applicability. *See, Martha Graham School and Dance Foundation, Inc. v. Martha*

---

[6] This Court has previously held that "licensee estoppel is an equitable doctrine, and a court remains free to consider the particular circumstances of the case, including the nature of the licensee's claim and the terms of the license." *Pride Publishing Group Inc. v. Edwards,* 2008 WL 2201516, 4 (E.D.Tenn.) (E.D.Tenn.,2008).

[7] The Defendant alleges that the Plaintiff's marks are generic, or merely descriptive.

*Graham Center of Contemporary Dance, Inc.,* 153 F. Supp. 2d 512, 523 (S.D. N.Y. 2001), judgment aff'd, 43 Fed. Appx. 408 (2d Cir. 2002) (after the licensor invoked its right to terminate the license "it relinquished its right to enjoy, or seek to enforce, the benefits" of a no-contest clause in the license.); Garri Publication Associates Inc. v. Dabora Inc., 10 U.S.P.Q.2d 1694, 1697, 1988 WL 252401 (T.T.A.B. 1988) ("[A] licensee is estopped to challenge the licensor's rights in the licensed mark during the time that the license is in force."); Estate of Biro v. Bic Corp., 18 U.S.P.Q.2d 1382, 1991 WL 325858 (T.T.A.B. 1991) (licensee is estopped from challenging the validity of the agreement on the basis of a lack of quality control based on facts that occurred during the time frame of the license); Arleen Freeman v. National Association of Realtors, 64 U.S.P.Q.2d 1700, 2002 WL 1359330 (T.T.A.B. 2002) ("Attacking the validity of the very marks she was licensed to use is the type of conduct which the doctrine of licensee estoppel is intended to prevent."); "The case for estoppel is strongest when the licensee's challenge rests on its own conduct under the license, such as an assertion of ownership based on the licensee's use of the mark during the term of the license or a claim of abandonment based on inadequate supervision of the licensee by the licensor… former licensees should not ordinarily be estopped from challenging the ownership or validity of the licensor's mark on the basis of facts arising after the termination of the license." Restatement (Third) of Unfair Competition § 33 (1995).

At this time, the Court finds that the Plaintiff has failed to show that the Defendant is engaging in the types of activities intended to be estopped by the common law equity doctrine. Accordingly, the Court finds that the doctrine of licensee estoppel should not apply.

## VII. Conclusion

For the reasons stated herein, the Plaintiff's Motion for Summary Judgment [Doc. 59] is **DENIED**.

       **IT IS SO ORDERED.**

                            **ENTER:**

                            s/ Thomas W. Phillips
                          United States District Judge