UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

INVISIBLE FENCES, INC., )
) Case No. 3:09-CV-25
v. )
) Judge Curtis L. Collier
FIDO'S FENCES, INC., )

# MEMORANDUM & ORDER

Before the Court are a number of pretrial motions filed by the parties. Plaintiff Invisible Fences, Inc. ("Plaintiff" or "IFI") filed three motions in limine seeking to exclude certain exhibits or classes of evidence (Court File Nos. 194, 196, 198). Defendant Fido's Fences, Inc.'s ("Defendant" or "Fido's Fences") responded in opposition (Court File Nos. 208, 209, 213) and IFI replied (Court File Nos. 217, 218). Fido's Fences filed its own motion in limine (Court File Nos. 190) to which IFI responded in opposition (Court File Nos. 214).[1]

For foregoing reasons, the Court **DENIES** IFI's first two motions in limine (Court File Nos. 194, 196) and **GRANTS IN PART** and **DENIES IN PART** its third motion in limine (Court File No. 198). The Court also **DENIES** Fido's Fences motion in limine (Court File No. 190).

## I. IFI'S FIRST MOTION IN LIMINE

In IFI's first motion in limine it seeks to exclude certain exhibits from trial. The Court will consider each group of exhibits separately.

### A. Video Clips

IFI first seeks to exclude video clips Fido's Fences designated as potential exhibits. In response, Fido's Fences states it will not use these exhibits at trial. Accordingly, the Court considers

---

[1] Fido's Fences filed a second motion in limine (Court File No. 200), which was withdrawn by stipulation of the parties.

this issue **MOOT**.

      B.      **Declarations of Non-Witnesses**

IFI also seeks to exclude sworn declarations and affidavits of individuals not identified as witnesses. Fido's Fences indicates two of the declarations are reserved for possible impeachment purposes and that it may use prior surveys of IFI's expert in discussion with the testifying witness at trial. IFI appears to concede such use would be permissible but that they are otherwise inadmissible. The Court thus considers this issue **MOOT** unless Fido's Fences attempts to use the declarations or affidavits for any other purpose in which case the Court will hear argument at that time.

Fido's Fences also indicates that two of the declarations qualify as admissions of a party opponent. IFI does not respond to this argument thus the Court assumes IFI does not dispute this. Accordingly, the Court **DENIES** IFI's motion on this ground.

      C.      **Settlement Communications**

IFI seeks to exclude communications that convey offers of compromise or constitute settlement negotiations. Fido's Fences indicates, with respect to one of the exhibits, it does not intend to introduce the document to prove liability or invalidity of IFI's claim, but only to rebut an assertion by IFI that it did not respond to its demand letter. IFI states, however, that it does not intend to assert that Fido's Fences did not respond to its demand letter. The Court therefore considers this issue **MOOT**.

Fido's Fences intends to offer the other two responses to demand letters, which were sent by non-parties to this action. One of the letters, D823, includes argument by counsel for a third party that the mark is weak. The other letter, D825, contains similar argument but does not appear

2

to contend the marks are generic. As IFI suggests, based on Fido's Fences response, it appears such letters would constitute hearsay. The Court cautions Fido's Fences that, if the Court's understanding of its intentions regarding these letters are accurate, they are likely inadmissible. However, Fido's Fences may well offer them for some other reason. IFI's hearsay argument was only raised in reply, leaving Fido's Fences without the opportunity to respond or to indicate a proper use for these exhibits. Accordingly, the Court will not yet exclude them.

### D. "Miscellaneous Hearsay"

IFI seeks to exclude a number of proposed exhibits, describing them as "miscellaneous hearsay." Some of the issues have been resolved as Fido's Fences has agreed to withdraw four of the exhibits. The rest of the exhibits, according to Fido's Fences, are printouts of internet documents not offered for the truth of the matter asserted but offered to demonstrate generic usage. Accordingly, the Court will not preclude Fido's Fences from offering these exhibits at this stage and **DENIES** IFI's motion on this ground.

For the foregoing reasons, the Court **DENIES** IFI's first motion in limine (Court File No. 194).

## II. IFI's Second Motion in Limine

In IFI's second motion in limine, it seeks to exclude some internet-related exhibits from evidence. The Court initially notes that IFI argues these exhibits must be authenticated. Fido's Fences responds that it does in fact intend to authenticate the exhibits. Accordingly, the Court will not grant IFI's motion on this ground. Moreover, a number of the exhibits have been withdrawn by Fido's Fences.

The remaining exhibits apparently show advertisements or excerpts from websites, books,

3

or publications. IFI claims these printouts are hearsay and points to *Ty, Inc. v. Softbelly's. Inc.*, No. 00 C 5230, 2006 WL 5111124 (N.D. Ill. Apr. 7, 2006). However, in *Ty*, the defendant did not dispute that the internet printouts constitute hearsay whereas Fido's Fences does dispute that characterization in this case.[2] *Id.* at *7. Moreover, other internet printouts were discussed in *Ty* and the Court reserved ruling on whether they were inadmissible under Fed. R. Evid. 403. *Id.* at *4. Although IFI attempts to distinguish the cases on which Fido's Fences relies for the proposition such printouts do not constitute hearsay, those distinguishing characteristics go to relevance, not to whether the evidence is hearsay. *See, e.g.*, *Ale House Mgmt., Inc. v. Raleigh Ale House, Inc.*, 205 F.3d 137, 141 (4th Cir. 2000) ("[T]o the extent that Raleigh Ale House relied on the fact that 'ale house' was used or 'listed' in public advertising or other media, the evidence was not presented for its truth but for the fact that it was so listed."); *Giggle, Inc. v. netFocal, Inc.*, 856 F. Supp. 2d 625, 633 (S.D.N.Y. 2012) ("Numbering over forty, the screenshots of websites and advertisements were used between 1996 and 2009 for products and businesses in the children's goods and services industry. . . . The evidence of the advertisements and websites, *which are themselves not hearsay*, was authenticated by an affidavit from Joseph S. Presta, counsel for Defendant.") (emphasis added).

IFI argues, because this evidence is of little value in demonstrating primary significance,

---

[2] The *Ty* court noted that the evidence was hearsay because it was offered to show "that these third parties used the 'Beanie(s)' mark." 2006 WL 5111124, at *7. However, the Court does not agree that this constitutes hearsay. The Court finds the following from *Foreword Magazine, Inc. v. OverDrive, Inc.*, No. 1:10–cv–1144, 2011 WL 5169384, at *4 (W.D. Mich. Oct. 31, 2011) persuasive: "[T]hese exhibits [screen shots of websites] are offered to show the use of trademarks in commerce or the mentioning of those marks by various news organizations. Plaintiff is clearly not offering these screen shots for the truth of the matter asserted. When a printout from a third party website is offered merely to show that certain images and text appeared on the website, they are not statements at all and thus fall outside the ambit of the hearsay rule." Again, IFI's attempt to distinguish this case goes to whether the evidence is relevant, not to whether it is hearsay.

4

Fido's Fences does not *really* offer it for non-hearsay reasons. This argument attacks not whether these internet printouts are hearsay but whether they are relevant to demonstrate primary significance. Such an argument was also raised in *Ty*, the case on which IFI relies, and although the court cautioned that "it is likely that such evidence will be excluded under Rule 403, Fed. R. Evid.," the court concluded "this issue is best addressed within the context of the presentation of evidence." *Ty*, 2006 WL 5111124, at *4. The Court agrees. The degree to which this evidence is relevant will depend on its presentation.

Moreover, "[i]n bench trials, the application of the unfair prejudice portion of Rule 403 has been seen as an unnecessary and 'useless procedure.'" *United States v. Hall*, No. 98–6421, 2000 WL 32010, at *2 (6th Cir. Jan.4, 2000) (citing 22 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5213 (1978 & Supp. 1999) ("Since the judge must hear the evidence in ruling on the motion to exclude the evidence under Rule 403, exclusion of the evidence on grounds of prejudice in a bench trial is described as a 'useless procedure.'")); *Schultz v. Butcher*, 24 F.3d 626, 632 (4th Cir.1994); *Gulf States Utilities Co. v. Ecodyne Corp.*, 635 F.2d 517, 519 (5th Cir. Unit A 1981)); *see also United States v. Sperl*, 458 F. App'x 535, 543 (6th Cir. 2012) (citing *Hall* for this proposition in the context of Rule 404(b)). Of course, "[e]xcluding relevant evidence in a bench trial because it is cumulative or a waste of time is clearly a proper exercise of the judge's power." *Schultz*, 24 F.3d at 632 (quoting *Gulf States*, 635 F.3d at 519). Those issues, however, are best determined in the context of the offered evidence. As the cases cited by IFI suggest, internet search results or other "snippets" sans context may be of minimal probative value in this case. *See In re Bayer*, 488 F.3d 960, 967 (Fed. Cir. 2007) ("Search engine results—which provide little context to discern how a term is actually used on the webpage that can be accessed through the

5

search result link—may be insufficient to determine the nature of the use of a term or the relevance of the search results to registration considerations."). But even minimal relevance may be enough to admit the evidence unless the Court concludes the evidence is cumulative or a waste of time. Because this is a bench trial, many of IFI's concerns are simply inapplicable. The Court is competent to discern which evidence is persuasive and which is not, and the Court is confident IFI is fully capable of raising such arguments at the appropriate time.

Some of the challenged exhibits are also examples of Fido's Fences's internet advertising that IFI has asserted constitute infringement. Thus Fido's Fences argues these advertisements are clearly relevant to that issue. IFI argues, however, that Fido's Fences "does not even attempt to explain how its advertisements would be relevant to the primary significance test." But the Court understands Fido's Fences argument to be that it intends to offer these advertisements for a different purpose: to refute or otherwise demonstrate how these advertisements are non-infringing. Such advertisements would be relevant to that showing. The Court will not exclude them. IFI also argues there are annotations on the advertisements and that some are illegible. These issues, however, should be addressed when the exhibits are offered into evidence so that the Court may consider these alleged inadequacies in the context of how and for what purpose the exhibits are offered.

There are other advertisements of third parties, or rather "snippets" of internet advertisements, using the term "invisible fence" that IFI argues are decontexualized and thus of little use in determining the primary significance of the marks. This may be so, but the Court fails to see how that renders the evidence inadmissible. As noted above, even minimal relevance may render this evidence admissible in a bench trial. IFI's argument against the persuasiveness of this evidence is just that: argument. These arguments may be made at the appropriate time.

6

IFI also seeks to exclude exhibits consisting of URLs only. Fido's Fences contends that three of these exhibits are not used only for their URLs but will be website screenshots to be authenticated at trial. Thus the Court does not exclude these exhibits on this ground.

IFI seeks to exclude "random, partial, illegible, or undated web page printouts." Fido's Fences withdrew a number of these exhibits in response to IFI's motion. To the extent IFI argues these exhibits are hearsay, the Court relies on its analysis above and concludes Fido's Fences does not seek to offer these exhibits for the truth of the matter asserted but only to demonstrate how the term is used. IFI also argues some of the exhibits appear to be incomplete, or to have obscured URLs, which must be properly authenticated. Fido's Fences indicates it intends to authenticate this evidence at trial. Accordingly, the Court will not exclude these exhibits at this time.

The parties also dispute whether some "compilation documents," in which various portions of websites have been pasted together, are sufficiently contextualized so as to be admissible. The Court concludes this question must be answered when the exhibit is offered at trial, as the Court is unable to determine its admissibility at this stage. These exhibits, of course, must also be properly authenticated and the Court is without the benefit of Fido's Fences's authentication witness. To the extent IFI further argues this evidence is inadmissible under Rule 403, the Court relies on its analysis above.

IFI argues evidence from foreign websites should be excluded because it is irrelevant to the primary significance of the marks to the consuming public, in this case, residents of the United States. In response, Fido's Fences withdrew a number of these exhibits. The exhibits it still seeks to offer are a United Kingdom website demonstrating usage by one of IFI's affiliates as well as a Canadian website containing a document authored by two residents of the United States. As Fido's

7

Fences notes, "[i]nformation originating on foreign websites or in foreign news publications that are accessible to the United States public may be relevant to discern United States consumer impression of a proposed mark." *In re Bayer*, 488 F.3d at 969. The probative value of such evidence must be discerned on a case-by-case basis. *Id.*

Here, the Court fails to see how these two websites are relevant. In this case, the Court must determine the primary significance of the mark to the consuming public. Websites authored by United States residents, or their affiliates, are not useful to that determination if aimed at a different population of consumers. A mark may be generic abroad but protected at home. *Fuji Photo Film Co., Inc. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 599 (5th Cir. 1985) ("The concept of territoriality is basic to trademark law; trademark rights exist in each country solely according to that country's statutory scheme."). However, the Court will not exclude these websites at this stage. The Court will consider the relevance of these exhibits at trial when Fido's Fences seeks to introduce them.

Accordingly, the Court **DENIES** IFI's second motion in limine (Court File No. 196).

**III.  IFI's Third Motion in Limine**

IFI's third motion in limine seeks to preclude Fido's Fences from offering evidence of genericness arising prior to the termination of the licensing agreement under the doctrine of licensee estoppel. Judge Phillips, who was previously assigned to this case, declined to impose licensee estoppel to prevent Fido's Fences from challenging the marks. Judge Phillips laid out the standard as follows.

> The doctrine or theory of licensee estoppel provides that a licensee should be, in many cases, "estopped from claiming any rights against the licensor which are inconsistent with the terms of the license." *Westco Group, Inc. v. K.B & Associates, Inc.*, 128 F.Supp.2d 1082, 1091 (N.D. Ohio 2001). For instance, after obtaining the

8

> benefit of a trademark license but breaching the terms thereof, a licensee should not be able to "benefit from its own malfeasance" by "challeng[ing] a licensor's ownership of a trademark." *Id* at 1086–89; *see also Big Boy Restaurants v. Cadillac Coffee Co.*, 238 F. Supp. 2d 866, 873–74 (E.D. Mich. 2002). The Supreme Court of the United States has done away with licensee estoppel in the patent context, but the doctrine remains part of trademark jurisprudence. *Lear, Inc. v. Adkins*, 395 U.S. 653, 674 (1969); *But see, Beer Nuts, Inc. v. King Nut Co.*, 477 F.2d 326, 328-29 (6th Cir. 1973) (distinguishing *Lear*).

(Court File No. 91, p.13). Judge Phillips concluded the record at that point did not counsel in favor of imposing licensee estoppel. He relied in part on a Middle District of Tennessee case, which concluded that "the doctrine of licensee estoppel should not operate as an *absolute* bar" to a defense that the mark is generic or descriptive. *Kebab Gyros, Inc. v. Riyad*, No. 3:09–0061, 2009 WL 5170194, at *6-7 (M.D. Tenn. 2009) (emphasis added). Judge Phillips also recognized the following from the Restatement, which introduces the issue at play here.

> The case for estoppel is strongest when the licensee's challenge rests on its own conduct under the license, such as an assertion of ownership based on the licensee's use of the mark during the term of the license or a claim of abandonment based on inadequate supervision of the licensee by the licensor… former licensees should not ordinarily be estopped from challenging the ownership or validity of the licensor's mark on the basis of facts arising after the termination of the license.

Restatement (Third) of Unfair Competition § 33 cmt. d (1995). Although Judge Phillips declined to estop Defendant in its prior order, he did so based on the record available at the time. Moreover, he did so in considering whether licensee estoppel should be a *complete* bar to Fido's Fences challenging the validity of the license. Here, the Court is concerned with the patch of the doctrine Judge Phillips left open: whether Fido's Fences's should be precluded from relying on evidence of genericness arising before termination of the license.

The following from McCarthy on Trademarks is instructive:

Many courts have adopted a view of trademark license estoppel under which a former licensee may challenge the licensor's title, but only on facts which arose after

9

the license contract has expired. That is, the estoppel covers only facts which occurred during the time frame of the license. As to facts which occur thereafter, the ex- licensee is in the same position as any other challenger of the validity of the mark. For example, the Trademark Board applied the licensee estoppel rule to prevent a former licensee of the REALTOR mark from challenging the mark as being a generic name for real estate agents. The facts on which the genericness challenge was based arose prior to and during the challenger's 20 years as a dues-paying member of the REALTOR association.

3 Thomas J. McCarthy, McCarthy on Trademarks and Unfair Competition § 18:63 (4th ed. 2006); *see also John C. Food of Va., Inc. v. John C. Flood, Inc.*, 642 F.3d 1105, 1110 (D.C. Cir. 2011) (noting "other circuits have permitted licensees to make such challenges, but only based upon facts that arose after the license expired" but declining to decide the contours of the doctrine); *Creative Gifts, Inc. v. UFO*, 235 F.3d 540, 548 (10th Cir. 2000) (estopping a licensee where it relied on evidence during the life of the license); *Prof'l Golfers Ass'n v. Bankers Life & Cas. Co.*, 514 F.2d 665, 671 (5th Cir. 1975) ("[A]fter expiration of the license, a former trademark licensee may challenge the licensor's title on facts which arose after the contract has expired.").

The Trademark Board opinion referred to in this section is *Arleen Freeman v. Nat'l Ass'n of Realtors*, 64 U.S.P.Q.2d 1700 (Trademark Tr. & App. Bd. June 18, 2002). The petitioner there sought to cancel the trademark for "Realtor" and "Realtors," arguing they are descriptive and generic. She relied on a telephone survey as well as usage in books and other print media. The telephone survey was conducted in 1999. The respondent argued licensee estoppel should be applied because the petitioner was a dues paying member of one of its associations between 1975 and 1996. The Board concluded the evidence of infringement within the time period the petitioner used the mark should not be considered under licensee estoppel. The petitioner's case for "genericness [wa]s based on her belief that respondent's collective membership marks were generic from the outset, and remained generic during her twenty-plus years as a dues-paying licensee." *Id.*

at *5. She benefitted from the goodwill of those marks while she was a member of the association. In seeking termination, she was "not [] claiming that these marks became generic after the termination of her license agreement. Rather, petitioner [wa]s relying on facts, including the meaning of the term Realtor, during the term of the license." *Id.* Thus the Board concluded that the petitioner was barred by licensee estoppel from challenging the marks and did not consider whether they were generic. *Id.*

Some district court opinions from this circuit have recognized a more conservative application of licensee estoppel. *See Kebab Gyros*, 2009 WL 5170194 at *6 n.7 (holding "from more recent case law in th[e Sixth] Circuit, that the licensee estoppel doctrine is currently applied as a non-rigid, equitable doctrine that is only employed based on a full consideration of the totality of the circumstances"); *Pride Publishing Grp. v. Edwards*, No. 1:08–cv–94, 2008 WL 2201516, at *4 (E.D. Tenn. May 23, 2008) (noting, in the naked license context, "licensee estoppel is an equitable doctrine, and a court remains free to consider the particular circumstances of the case, including the nature of the licensee's claim and the terms of the license") (quoting Restatement (Third) of Unfair Competition § 33 cmt. d (1995)). Although the Sixth Circuit has had little to say on the issue, it has applied it in some circumstances. *See E.F. Prichard Co. v. Consumers Brewing Co.*, 136 F.2d 512, 522 (6th Cir. 1943); *Beer Nuts, Inc. v. King Nut Co.*, 477 F.2d 326, 329 (6th Cir. 1973) ("[T]he public interest in guarding against the depletion of the general vocabulary available for the description of articles in commerce is not so great that it should take precedence over the rule of the law of contracts that a person should be held to his undertakings. Such a decision is far from unique. In *E. F. Prichard* . . . , this court held that a contract declaring one party to be the owner of a trademark would estop the other party from later contesting the mark's title."); *see also Pride*

11

*Publishing*, 2008 WL 2201516, *4 ("The Sixth Circuit has, however, allowed a licensee to raise a naked licensing defense against a licensor while applying the doctrine of licensee estoppel to bar the licensee's other challenges as to trademark ownership.") (citing *E.F. Prichard*). The Court concludes the doctrine is applicable in this case to the extent it precludes Fido's Fences from relying on evidence of genericness from before the license was terminated.

Fido's Fences argues this determination must be made *after* trial when the Court has considered all of the evidence and is in a position to determine whether the equities weigh in favor of the doctrine's application. Fido's Fences, however, fails to cite any authority suggesting the Court must wait until after trial to weigh the equities. Nor does this argument hold much water. This case is, by choice of the parties, a bench trial. Were this case a jury trial, the Court would be required to determine whether to preclude the introduction of evidence arising prior to termination of the license agreement before it is offered to the jury. Moreover, because this is a bench trial, the Court has the benefits of the parties' proposed findings of fact and conclusions of law. The Court has before it Fido's Fences's theory of this case and its interpretation of the evidence it intends to offer. The Court is in a position to determine whether licensee estoppel should apply.

Fido's Fences urges the Court to adopt the Second Circuit's view "that every claim of licensee estoppel should be evaluated by balancing the public interest in favor of challenging invalid trademarks against the private interest in the enforcement of contracts." *John C. Flood*, 642 F.3d at 1110 (citing *Idaho Potato Comm'n v. M & M Produce Farm & Sales*, 335 F.3d 130, 137 (2d Cir. 2003)). Fido's Fences significantly relies on *Idaho Potato*. In that case, the defendant argued the district court erred in ruling that a no-challenge provision in its licensing agreement barred the defendant from seeking cancellation of a certification mark. Considering *Lear, Inc. v. Adkins*, 395

12

U.S. 653 (1969), in which the Supreme Court held that licensee estoppel was inapplicable in the patent context, and its progeny, the Second Circuit concluded it must weigh the public interest at issue against the policy of enforcing agreements. Given that *Idaho Potato* dealt with a certification mark, the court was called to distinguish between certification marks and trademarks. "In the trademark context . . . [a] dealer's good will is protected . . . in order that the purchasing public may not be enticed into buying A's product when it wants B's product." 335 F.3d at 138 (internal quotation marks omitted). Thus, "the important issue in litigation over trademark contracts is the public confusion that might result from enforcing the contract." *Id.* Whereas trademark owners can choose to license their marks on conditions they deem appropriate, certification mark licensing programs are a form of limited compulsory licensing and the certifier has a duty to certify the mark of anyone who meets the standards and conditions the mark certifies. Because "the certification mark regime protects a further public interest in free and open competition among producers and distributors of the certified product," *id.*, the public interest was not significantly different from the interest protected by the patent laws in *Lear*.

The court then concluded the contract provision injured this public interest in three ways. First, "the provision places a non-quality-control related restriction on the sellers of the certified product and other licensees that benefits the mark owner in contravention of the mark owner's obligation not to interfere with a free market for products meeting the certification criteria." *Id.* at 139. Second, "parties that have entered into a licensee relationship with the IPC may often be the only individuals with enough economic incentive to challenge the IPC's licensing scheme, and thus the only individuals with enough incentive to force the IPC to conform to the law." *Id.* Finally, the merits of the challenge by the defendant counseled against enforcing the provision because they

13

went to maintaining a free market for the certified product.

However, as a brief perusal of *Idaho Potato* suggests, the case is quite different. Obviously, this case deals with a *trade*mark not a certification mark. Thus the first concern in *Idaho Potato* is inapplicable here. Second, parties who have entered into licensee relationships with IFI are not the only ones with an economic incentive to force IFI to conform to the law. Part of Fido's Fences's argument is that IFI has sent cease and desist letters to many entities and individuals who compete with IFI in the pet containment system injury. Any one of those recipients has an economic incentive to challenge the mark. Defendant accuses Plaintiff of having a "longstanding monopoly at the expense of the public" but this conflicts with its argument that Plaintiff has sent thousands of cease and desist letters, takedown notices, and other such mailings to competitors who claim the mark is generic. Clearly Plaintiff's "monopoly" has not impeded the industry if so many competitors abound.

Finally, none of the grounds articulated in *Idaho Potato* that implicate the public interest in maintaining a free market are present here. There is consumer choice in this case, as indicated by Fido's Fences's accusation that IFI liberally disperses cease and desist letters to its competitors. IFI simply does not have the market control that the plaintiff in *Idaho Potato* did. Rather, Plaintiff is a major distributor of branded products in a competitive market. Defendant simply seeks to divest it of what it sees as a competitive advantage. The public, however, is not disadvantaged by the mark.

As was the case in *John C. Flood*, the Court concludes the result would be the same in this case regardless of whether the analysis articulated in *Idaho Potato* were controlling. "The theory underlying the licensee estoppel doctrine is that a licensee should not be permitted to enjoy the

14

benefits afforded by the license agreement while simultaneously urging that the trademark which forms the basis of the agreement is void." *John C. Flood*, 642 F.3d at 1111 (citing *Lear*, 395 U.S. at 656). Here, Fido's Fences benefitted from these marks for nearly two decades. Only after the business relationship turned sour did Fido's Fences see fit to assert the marks were never capable of protection. Fido's Fences reaches as far back as the 19th century in this case to demonstrate that, not only are these marks generic *now*, but they have *always* been generic. Thus Fido's Fences reaped the benefit of IFI's "monopoly" over the course of two decades, but now that it has been cut off, it seeks to tear down an allegedly unprotectable mark. The doctrine of licensee estoppel simply does not allow such conduct. *See Arleen Freeman*, 64 U.S.P.Q.2d 1700, at *5.; *see also John C. Flood*, 642 F.3d at 1111 (concluding licensee estoppel applies in part because "Virginia Flood, which has benefitted from its license of the disputed marks for over two decades, now asks us to declare that the licensed trademarks have been void since 1993").

However, the Court does so at this stage only with respect to the "invisible fencing" mark. As Fido's Fences indicates, the agreement only explicitly mentions that mark and does not explicitly refer to the "invisible" or "invisible fence" marks. This is no absolute bar to the application of estoppel with respect to these marks. Section 9(a) of the agreement specifies the following.

> Dealer shall use such trade names, trademarks, service marks, designs, slogans and similar property of the Company and Manufacturer, including the trademark "Invisible Fencing" (herein called "Proprietary Marks"), as Company shall designate in marketing the Invisible Fence System.

Thus the agreement incorporates more than the "invisible fencing" mark; it covers all marks "designate[d] in marketing the Invisible Fence System." In IFI's proposed findings of fact, it states that all three of the marks were designated by 1992. If that is the case, estoppel would be appropriate for all the marks. The Court is given no pause by Fido's Fences's argument it was

15

"unaware" that IFI asserted right to the "invisible" mark until after termination of the agreement.[3] The agreement makes clear the use and acknowledgment of the marks extends to any designated marks. At this point, however, the Court has not taken evidence that demonstrates these marks were designated and has not been directed to any such evidence in the record. Although IFI points to a trial exhibit in its proposed findings of fact, that exhibit has not been admitted nor has it been provided to the Court for consideration of IFI's motion in limine. The Court simply cannot make this determination with respect to "invisible" and "invisible fence" at this stage.

The Court concludes that equities weigh in favor of applying the doctrine of licensee estoppel with respect to the "invisible fencing" mark. Fido's Fences must only rely upon post-termination evidence in demonstrating that IFI's mark is generic. The Court cannot, however, make that determination with respect to IFI's other marks until it has received evidence that those marks were designated pursuant to § 9 of the agreement. IFI's third motion in limine is **GRANTED IN PART** and **DENIED IN PART** (Court File No. 198).

## IV.     Fido's Fences's Motion in Limine

Fido's Fences has filed its own motion in limine. Fido's Fences seeks to exclude "awareness" studies performed by IFI and relied upon in part by IFI's expert Dr. Erich Joachimsthaler. Fido's Fences argues that these "brand awareness" studies did not seek to determine whether the term "invisible fence" is recognized by consumers as a brand, but rather whether the term "invisible fence" is recognized as a pet containment product.

Fido's Fences first seeks to exclude these studies, and Dr. Joachimsthaler's testimony relying

---

[3] And Fido's Fences's contention the "invisible" mark was not registered at the time of the agreement is simply not true for the 1996 agreement: "invisible" was registered in 1993 (Court File No. 60-3).

on these studies, on the ground they are not relevant under Fed. R. Civ. P. 402. Fido's Fences notes the following from McCarthy on Trademarks:

> A survey must be directed at the issue of consumer perception as to the significance and meaning of the designation in issue. A survey that merely tests for consumer awareness of the designation is irrelevant. Similarly, asking a question that is not directly relevant to the issue of genericness is irrelevant.

2 Thomas J. McCarthy, Mccarthy on Trademarks and Unfair Competition, § 12:14 (4th ed. 2012). Because the awareness studies do not provide evidence that the marks are not generic, Fido's Fences argues they are irrelevant. Fido's Fences goes into considerable detail explaining why the awareness studies fail to provide evidence relevant to whether the marks are generic.

In response to Fido's Fences's motion, IFI states this evidence is relevant to other issues the Court must resolve such as the likelihood of confusion and to quantifying IFI's injury were the Court to find Fido's Fences infringed its marks. Moreover, IFI argues, although brand awareness studies may be sufficient to demonstrate primary significance, it is still relevant to that determination in conjunction with other evidence.

Regardless of the awareness studies' relevance to primary significance, the Court concludes this evidence must not be excluded as irrelevant. After all, as IFI argues, it is relevant to other issues the Court must resolve. In light of Fido's Fences decision not to reply to IFI's response, the Court assumes this is the case. Moreover, Magistrate Judge Guyton also considered these issues in connection with Fido's Fences's motion to exclude Dr. Joachimsthaler's testimony and concluded his testimony would "assist the trier of fact to understand the evidence and to determine a fact in issue" (Court File No. 203, p. 5). The Court agrees with Judge Guyton's conclusion that, to the extent Fido's Fences disputes the persuasiveness of these studies on the primary significance issue, cross-examination, contrary evidence, and argument are the best ways to address those concerns.

17

Thus the Court will neither exclude the evidence under Rule 402 nor exclude Dr. Joachimsthaler's testimony under Rule 702.[4]

Finally, Fido's Fences seeks to exclude the brand awareness studies under Rule 403 because of "unfair prejudice" and "confusion of the issues." As discussed above, however, these concerns are of minimal value in a bench trial. The Court is confident it can accord the evidence whatever weight, if any, it deserves.

Accordingly, the Court **DENIES** Fido's Fences's motion in limine (Court File No. 190).

**SO ORDERED.**

**ENTER:**

/s/
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**

---

[4] Judge Guyton, of course, already answered this question when he denied Fido's Fences's motion to exclude. To the extent Fido's Fences seeks another bite at the *Daubert* apple, the Court denies it that opportunity.